UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-vs- 14-CR-102

GREGORY KWIATKOWSKI, RAYMOND KRUG
and JOSEPH WENDEL,

Defendants.

---

Proceedings held before the

Honorable William M. Skretny, Robert H.

Jackson Courthouse, 2 Niagara Square,

Buffalo, New York on November 8, 2016.

APPEARANCES:

MARY CATHERINE BAUMGARTEN, and
AARON J. MANGO,
Assistant United States Attorneys,
Appearing for the United States.

PAUL J. CAMBRIA, JR., ESQ.,
JUSTIN D. GINTER, ESQ., and
ERIN McCAMPBELL, ESQ.,
Appearing for Gregory Kwiatkowski.

TERRENCE M CONNORS, ESQ., and
NICHOLAS A. ROMANO, ESQ.,
Appearing for Raymond Krug.

RODNEY O. PERSONIUS, ESQ.,
Appearing for Joseph Wendel.

AUDIO RECORDER: Jane Kellogg

TRANSCRIBER: Michelle L. McLaughlin, RPR,
Court Reporter,
(716)332-3560

(Proceedings recorded by electronic sound
recording, transcript produced by computer.)

THE CLERK: All rise.
THE COURT: Okay. Good morning.
MR. CAMBRIA: Morning.
THE COURT: Please have a seat.
MR. PERSONIUS: Morning, Judge.
THE COURT: Good morning. Okay. I think I know most everybody here, but we are being electronically recorded. I do not have a court reporter available today, so I'm going to ask everybody to identify himself or herself on the record.
Miss Labuzzetta, if you would call the case, please.
THE CLERK: Criminal case 14-102S, United States of America versus Gregory Kwiatkowski, Raymond Krug, and Joseph Wendel.
THE COURT: Okay. Miss Baumgarten, would you start, please, for the government.
MS. BAUMGARTEN: Morning, Judge. Katie Baumgarten for the United States.
THE COURT: And assisted by?
MR. MANGO: Good morning, your Honor. Aaron Mango for the United States.
THE COURT: Okay. Good morning.
All right. Mr. Cambria, if you would announce

yourself and your team for Gregory Kwiatkowski, please.

MR. CAMBRIA: Good morning, your Honor. Paul Cambria and Erin McCampbell, Justin Ginter on behalf of Mr. Kwiatkowski.

THE COURT: Okay. Good morning to all.

Terry Connors, and your team, please?

MR. CONNORS: Morning, your Honor. It's Terry Connors and Nick Romano for Raymond Krug.

THE COURT: Okay. Good morning all.

And finally, Mr. Personius.

MR. PERSONIUS: Your Honor, Rodney Personius alone for Mr. Wendel, and Mr. Wendel is present with me.

THE COURT: Okay. And you're soloing without a crew?

MR. PERSONIUS: Yes, your Honor.

THE COURT: Okay. Okay. Good to see everybody here. And we have, as we all know, a December starting date of December 6th for trial purposes. I know I have some motions in limine, and I will announce my decisions with respect to those this morning.

I do have a checklist with respect to this five-count indictment, and I'd like to go over that

with you before I get to the decision on the motions in limine. Also, if there's anything that we need to discuss that I don't touch base on with my checklist, let me know, we'll address that.

MR. PERSONIUS: Your Honor, pardon me. May I be heard on one issue before we get started?

THE COURT: Certainly. Certainly. Mr. Personius.

MR. PERSONIUS: We have mentioned to Miss Baumgarten and Mr. Mango that there's at least one individual, if not two, in the courtroom that we may be calling as defense witnesses at trial. One is Annette Parker, who is the woman in the middle in the front row, and the other is Mary Silmon, who is the woman to her right. And depending on what the Court contemplates happening this morning, if we were going to get into any meaningful discussions about the trial strategy or the defense theory of the case, that -- that type of thing, it would be the defense request that Miss Parker and Miss Silmon be excused from the courtroom. I know that it's a public courtroom, and if we're only going to talk about the Court's decision and we're not going to get into further discussions about defense theory, I don't think

there is any harm in them being here. But if we were to get into those issues, we'd ask the Court to consider that request.

THE COURT: Okay. And I appreciate you calling that to my attention. I personally don't at this point intend to get into any of the specifics that might relate to theory and those types of related discussions, so from my standpoint, given the fact that we are an open courtroom, I'm going to let matters stand, unless there's an objection from the government.

MR. MANGO: No, your Honor.

THE COURT: Okay.

MR. PERSONIUS: Thank you, Judge.

THE COURT: And if anybody thinks we're going off track if that regard, let me know, and I'll reconsider.

MR. PERSONIUS: Thank you.

THE COURT: Okay. Thank you.

Okay. Miss Baumgarten, let me just start where I normally start with respect to any update with respect to proceeding in a fashion that does not involve trial for any of the defendants in this case, and that is, to wit, plea discussions.

MS. BAUMGARTEN: The government has always

remained open to those discussions, your Honor. I have tried. We have had some discussions. It is my understanding that the defendants are rejecting those discussions.

THE COURT: Okay. And are you at some point going to put on the record the -- for purposes of Frye and Lafler what has been communicated to counsel and what has been -- from the government, and then what counsel has then similarly discussed with clients?

MS. BAUMGARTEN: Well, I can do that at this point, Judge. Misdemeanors have been offered, at least in theory. It would require final approval from the acting U.S. attorney. It is my understanding -- and there is some -- you know, put it this way, understand that at least on behalf of one of the defendants and possibly another they've been outright rejected to any type of a plea. So, I can't -- I don't want to get too much into it, because I know the Court doesn't wish to. But in those circumstances, your Honor, there's really, you know, with an outright rejection of everything, and --

THE COURT: Okay. With the understanding that obviously it's the government's burden of

proof with respect to all five charges to establish your case beyond a reasonable doubt. There's no burden on any defendant. It's an absolute right of each defendant to demand his trial right, and presumption of innocence attaches.

Has the -- whatever you made reference to, has that been reduced to writing or has that just been oral communication amongst counsel?

MS. BAUMGARTEN: Well, I did -- I did indicate to defense counsel that I would reduce it to writing if there was any interest whatsoever. On behalf of one of the defendants directly, absolutely outright rejection, and another one it appears also to be a rejection of anything, any criminal -- I don't really wish to --

THE COURT: I'm not asking you to.

MS. BAUMGARTEN: I don't think that would be fair, your Honor.

THE COURT: All right. Mr. Cambria, with respect to Mr. Kwiatkowski, defendant Kwiatkowski, that's an accurate statement, and whatever there is that was communicated to you along those lines you fully discussed with your client?

MR. CAMBRIA: Yes, your Honor. I think that the way it was posed is it was all three or

nothing. And I -- from what's been stated here so far, I think you can understand then why it's not happening.

THE COURT: All right. That's an accurate statement, I take it, Miss Baumgarten?

MS. BAUMGARTEN: It is in particular with respect to these defendants. I mean, if we could engage in any discussion, but two have outright rejected, your Honor.

THE COURT: Okay. All right. And, I mean, if any defendant disagrees, whether it's you, Mr. Kwiatkowski or Mr. Krug or Mr. Wendel, with anything you're hearing, just let me know. I'll give you some time to discuss matters with your attorney, and then I'll ask for a statement to clarify on the record. Okay?

All right. Mr. Connors, the communication that's been alluded to or at least been specifically referenced by Miss Baumgarten, that's essentially accurate as supplemented by Mr. Cambria and that has been the subject of your communications with Mr. Krug?

MR. CONNORS: Essentially accurate, your Honor.

THE COURT: Okay. All right.

Mr. Personius?

MR. PERSONIUS: It is accurate, your Honor, in substance.

THE COURT: Okay. Okay. Thank you. Any defense counsel not prepared and ready to go to trial on December 6th?

MR. PERSONIUS: Your Honor, we're prepared on behalf of Mr. Wendel.

THE COURT: Okay.

MR. CAMBRIA: We are as well.

MR. CONNORS: We are also.

THE COURT: Okay. All right. And that was Personius and Cambria and Connors in that order.

All right. As far as voir dire is concerned, as counsel know -- and I have your submissions in terms of proffered questions -- I will be handling the voir dire, as I do. And I will work with the joint submission and the government's proffer as well, and I will determine what questions will be asked, and we will work through voir dire on that basis. If anything comes up, I'll give counsel the opportunity to input me during -- or at least at the conclusion of my questioning before we get to peremptory and before we get to challenges for

cause.

MR. CONNORS: Your Honor, may I be heard on that for one moment?

THE COURT: Sure.

MR. CONNORS: With respect to the voir dire --

THE COURT: Mr. Connors, excuse me.

MR. CONNORS: I'm sorry. That's Terry Connors. With respect to the voir dire questions, your Honor, as you know, we did submit a joint list of questions initially. But, of course, you can imagine, as you get closer to trial there are a number of issues that start to emerge as we go through reams of documents, and I have in my own mind set forth two areas that I think need to be discussed, and I'd like to ask you, would you be amenable to a supplemental submission on the joint questions?

THE COURT: Yes.

MR. CONNORS: And the other question I have is this, your Honor.

THE COURT: Let me do this, let's set a November 30th cutoff for that.

MS. BAUMGARTEN: Could we have it a little earlier, Judge, so if we felt the need to respond

we could, your Honor?

THE COURT: Okay. All right. The 25th. That's a Friday I think. All right. And then the 30th for any government response.

MS. BAUMGARTEN: Thank you, Judge.

THE COURT: Okay.

MR. CONNORS: And the second point on that direct topic, your Honor, is would you ever consider the use of a questionnaire in this particular proceeding? I wouldn't anticipate a lengthy questionnaire, but there are a number of issues that we have detected in the course of our preparation that lend itself toward some type of a private statement by some of the jurors, and in this case, a questionnaire might be appropriate.

I know from your history in other cases that you've not used that. Quite often you've passed on that opportunity. But here in this situation, we think it might be helpful to allow some of the jurors to express some of their opinions privately rather than have to do that in the jury box. So would that be something you would consider in this case, your Honor?

THE COURT: All right. Let me get the position of the government on the questionnaire.

MS. BAUMGARTEN: Judge, in having sat through several jury selections with the Court, I believe the Court can work through those issues without the necessity of a questionnaire. I think it's flat on paper. And one of those things that the Court in its experience goes through is evaluating the demeanor of the individual making that response. And I think that would be potentially detrimental to really picking a fair jury in this. And the Court wouldn't have that flavor by just reading a flat word.

THE COURT: Okay. I mean, you're right, Mr. Connors, I mean, I haven't entertained the use of a questionnaire very often. I will consider it but I want to know, Mr. Personius, is that also your request?

MR. PERSONIUS: It is, your Honor. I seem to recall that we used a questionnaire maybe in the Tonawanda Coke case. Mr. Mango may recall that. I got it in my head that we did. In one case I've had with you we used it.

In response to Miss Baumgarten's remark about it being flat, I don't think it worked that way. I think it was a helpful starting point, and it provided the opportunity for follow-up questioning

if needed at the time of the jury selection. It wasn't just left there and not dealt with.

THE COURT: Okay. Mr. Cambria?

MR. CAMBRIA: I, your Honor, used questionnaires several times. As you know, in the stateside they have a questionnaire they always use. And I find that it allows you to focus and get past the kind of general stuff and hone in, if you will, on important issues that could make the difference between cause and peremptory, and that they really are an expediting tool, and especially if it's just, you know, one page or two sides at most questionnaire that hits the important parts. It seems to me then it's easier for the Court to follow-up and to focus, and it makes it easier for us to either challenge for cause or peremptorily.

THE COURT: Okay.

MR. PERSONIUS: Judge, pardon me. I'm sorry, Aaron. If it wasn't Tonawanda Coke, maybe it was the Local 17 case. I just remember we used a questionnaire in one of our cases recently.

THE CLERK: I don't remember a questionnaire ever being used.

MR. MANGO: If I may, Judge, Aaron Mango for the United States. We did not in Tonawanda

Coke. It was requested by the defense. It was opposed by the government. We filed submissions on it. It would be at least -- you know, it's tough to kind of take the government's position in a vacuum. I mean, in the Tonawanda Coke case there was an actual proposed questionnaire that the defense filed that they wanted to use. We had the ability then to make arguments based on that questionnaire. So in the -- in generalities, I mean, I'm sure we could talk about it. But I think it's really helpful maybe as part of the deadlines you've already submitted, you know, a formal motion by the 25th with the proposed questionnaire. And we can look at it and we can respond by the 30th.

THE COURT: All right. Actually I think that's a good suggestion. The concern primarily is usually the overwhelming nature of the questionnaire that's being floated and proposed. And I think that can do a disservice. I mean, in this case -- I mean, you all know what the five charges are. And, you know, they're not multi-facetted with parts and subparts and everything else.

And I'll do it on a motion basis, Mr. Connors. I think that's a good suggestion. So, we'll use

the same dates, the 25th with an attached survey accompanying the motion, and the government's response by the 30th.

THE CLERK: Judge --

THE COURT: Yes?

THE CLERK: It was in Local 17 there was a request made. That's exactly what happened. But it was denied. So it wasn't done in Local 17.

THE COURT: Okay.

MR. PERSONIUS: Thank you.

THE COURT: Okay. So, all right. You know, without overcomplicating things I can we can move on from there.

Okay. As far as your -- the matter of jury charges, what I like to do and which is my practice is to have you receive a proposed jury charge, which I consider to be a living document, before we have opening statements. And that will give you some idea of what my thinking is and where I feel we should be going from the standpoint of the applicable law and the stock portion of the charge as well. So, I'll try to have that for you at our final status. Is that on the 5th? Yes? On the 5th, okay. And then you can work with that before your openings. And I'd like to on the 5th, giving

you the benefit of needing some time to figure out whether you wish time for an opening statement or not, and how much time, we can discuss that as well with respect to the final status on Monday the 5th, and in connection with the proposed charge that I give you.

Witness list. You know, I have respectively 17 and 23 witnesses government, defendant. I'm going to work with that list. If there's any supplements, please get those to me by the same dates. I think that will be helpful. And keep in mind that I am going to ask the government to keep the defense on notice at least a day in advance of any witnesses you're going to be calling. Witnesses will be excluded from the courtroom unless -- and I'm anticipating that's what the defense request is.

MR. CAMBRIA: It is.

THE COURT: -- based on your statement, Mr. Personius.

MR. PERSONIUS: Yes, your Honor.

THE COURT: Okay. That only relates to testimony -- well, before testimony. After testimony, it's an open courtroom as far as that witness is concerned.

All right. I still have no expert witnesses. I'm going to proceed on that basis. I do have the respective exhibit list.

Miss Labuzzetta, are you going to meet with defense counsel and the government with respect to JERS and the operation of the technology?

THE CLERK: We'll have to set a date for that, Judge.

THE COURT: Okay. And by JERS, if you don't know, JERS is the new system which will enable the jury to access those exhibits that were received into evidence from the jury room. All right. So they'll have access electronically during deliberations. And Miss Labuzzetta will explain to everybody how that works. I think it's a phenomenal system. We've been working on it and fine tuning it. I think it will facilitate deliberations in the case, and I think it makes deliberations even more fair to both sides.

MR. PERSONIUS: Your Honor, on that note, when we have the meeting with Miss Labuzzetta, would we be permitted to go to the jury room and see how that works, just to get a sense of it?

THE COURT: Absolutely. Absolutely.

MR. PERSONIUS: Thank you.

THE COURT: Okay. And then please make sure that you have your technology people accessible so that, you know, we can tap into them. I mean, they may want to see the operation of JERS as well. But at least for purposes of evidence presentation during the trial, your people should be here and go through the same instruction with Miss Labuzzetta.

Okay. I don't have a joint statement of the case. I would like you to continue to work on that, see if you can come up with one. If not, I will work on it, and, you know, then you -- it's caveat emptor at that point in time, okay?

Stipulations. Whatever you can do to facilitate that, please continue to work on that. I mean, I don't expect you to stipulate to matters that are going to be the subject of testimony. That doesn't make any sense. So, I mean, don't even bother discussing that. Just proceed testimonially. But if there's a way of expediting the presentation of the evidence through stipulations, please make an effort to do that. That's always very helpful.

I think we're still talking seven to nine trial days in this case. Is that a fair statement from

the government's standpoint?

MS. BAUMGARTEN: Yes, I think so, Judge.

THE COURT: All right. From the defense standpoint, are we in the ballpark with those numbers?

MR. CAMBRIA: I believe so.

THE COURT: Fewer than that or -- Mr. Cambria?

MR. CAMBRIA: I would think that that's a fair statement, your Honor, seven to nine.

THE COURT: All right. Mr. Connors?

MR. CONNORS: I always allow for a little latitude, your Honor. Looking through the witness list, it may go a touch longer. My question to you though is are there down days that you will apprise us of?

THE COURT: Yeah. I'll give you my list of what days we're going to be up and any interruption during the course of the evidence week. I'll do that as quickly as I possibly can get that information to you.

Mr. Personius --

MR. PERSONIUS: That estimate seems reasonable from our perspective, Judge.

THE COURT: Okay. All right. So after

court today you can get together with Miss Labuzzetta and arrange scheduling for the technology workshop, so to speak.

All right. Peremptory challenges. What I'm going to do is this: We have the six rounds that are typical, and then we're going to have one round for alternates. Two alternates in this case. Each party will have one peremptory challenge for each round. So the government has six the first go around. Each defendant has one per round for the six rounds. And same thing, it will be one and three for the alternates on the alternate selection round.

MR. PERSONIUS: Pardon me, Judge. I was writing something. For the alternates the government has?

THE COURT: One.

MR. PERSONIUS: One. And the defense?

THE COURT: Each one.

MR. PERSONIUS: Okay. Thank you.

THE COURT: Okay. I do have a motion to modify conditions. I'm not going to entertain argument or anything like that, but I am going to remove the condition with respect to Mr. Kwiatkowski, but he will remain on supervision.

And upon reasonable suspicion, were that to take place, there's still discretion to request random testing. Okay -- with respect to controlled substances. I mean, that's where we are on that.

We have the motions in limine. I'm going to announce my bench statement at this point in time. I've asked Miss Labuzzetta to put this up on your respective screens and you can follow along and --

MR. CAMBRIA: Can you make it brighter?

THE COURT: I'm sorry?

THE CLERK: (Inaudible.)

THE COURT: I think that's --

THE CLERK: (Inaudible.)

THE COURT: Okay. We'll start with the introduction and the reference there to the several pretrial motions that are presently before me. I have considered those motions. I'm ready to rule at this time. Because counsel are familiar with the facts and arguments, I'm not going to go through any of that in detail, and I will get right to my rulings.

As far as defendant Kwiatkowski's motion in limine, first I will address his seeking to preclude evidence regarding the prior representation of one of the alleged victims in

this case. And he seeks this restriction because Michael Stuermer, a partner at your firm, Mr. Cambria, once represented one of the alleged victims in a separate criminal matter. This issue was raised earlier in proceedings before me -- or at least before the court, at which time Magistrate Judge Schroeder ruled that the presumption of shared confidences within the law firm of Lipsitz, Green, Scime, Cambria, LLP, and specifically between Mr. Cambria, who represents Mr. Kwiatkowski, and Mr. Stuermer, who represented one of the alleged victims, had been rebutted, and there was therefore no conflict in Mr. Cambria's representation. Consistent with that finding, the government does not now oppose the motion. Further, any evidence or testimony on this point is not relevant to the case at hand. Accordingly, the motion is granted.

All right. Second, the government has filed a motion to preclude certain evidence and to limit cross-examination of the alleged victims and some topics. To begin, the government seeks preclusion of any reference to potential punishment faced by the defendants as well as evidence of defendants' prior commendations or awards on the grounds that

such evidence is irrelevant and unfairly prejudicial. The defendants do not oppose this motion. Accordingly, the motion is granted.

The government next seeks to preemptively preclude defendants from presenting evidence or testimony that was not timely disclosed and for which the delay in disclosure is not excusable. Defendants acknowledge that they received the government's request for reciprocal discovery, but state that they are not in possession of any items they intend to use at trial and have not already disclosed. Based on defendants' representation that they are not currently aware of any evidence that they intend to use and have not yet disclosed, this request is denied without prejudice. I will reconsider this request at trial only if the government renews the argument.

The government next seeks to preclude cross-examination and introduction of evidence regarding certain events and circumstances outside the alleged criminal use of force. The alleged criminal acts in this case took place in the early morning hours of May 31st, 2009, following an incident where the alleged victims fired a BB gun from a car at the corner of Main and Custer Streets

in Buffalo. The alleged victims were arrested shortly after at a house nearby, which is where the alleged illegal use of force occurred.

The government states that it expects the alleged victims will admit to their involvement in the BB gun incident at the corner of Main and Custer Streets during their direct examination. Nevertheless, the government seeks to preclude testimony and evidence regarding the BB gun incident except evidence of the circumstances existing at and immediately prior to the defendants' alleged crime.

Specifically, the government seeks to preclude defendants' cross-examination of the alleged victims, as well as introduction of evidence in three areas, one, the alleged victims' criminal histories, including their arrests for the BB gun incident at the corner of Main and Custer that resulted in a plea to a noncriminal violation; two, BB gun incidents or uncharged conduct involving the alleged victims; and three, a civil suit that the alleged victims initiated against the city related to the May 31st, 2009, arrest.

The government argues that none of the alleged victims has been convicted of a felony or a

misdemeanor that involved dishonesty or false statement, and so their criminal histories are generally not admissible to attack their character for truthfulness under Federal Rule of Evidence 609. They further argue that any uncharged conduct related to the BB gun incident at Main and Custer or any other BB gun incidents is irrelevant and unfairly prejudicial, or that cross-examining the alleged victims on these topics would violate Rule 611's limitations on the scope of cross-examination.

Defendants oppose the motion to preclude on two grounds. First, defendants argue that they should be permitted to question the alleged victims and introduce extrinsic evidence to demonstrate bias. They contend that although the alleged victims' criminal histories would usually not be admissible under Rule 609, restricting cross-examination in this case or precluding extrinsic evidence would violate their confrontational rights under the Sixth Amendment. They further contend that this evidence, as well as the other uncharged incidents and the civil suit, could be used to demonstrate the witnesses' potential bias against the defendant, their motivation to lie, ulterior

motives, and self-interest. Second, defendants argue that the evidence of what was known to the defendants at the time of the alleged criminal use of force is relevant to whether that use of force was reasonable.

As an initial matter, with respect to the government's request that defendants not be allowed to, quote, delve into, close quote, the May 31st incident at the corner of Main and Custer during cross-examination of the government witnesses, the government motion is denied. Although the evidence does not appear to be in dispute, the alleged victims' involvement is part of the overall factual scenario that makes up this case. Accordingly, it is relevant and not unfairly prejudicial to allow the defendants to question the government's witnesses regarding the events occurring May 31st, 2009.

Outside cross-examination of the alleged victims regarding the events occurring on May 31st, 2009, I do not intend to conduct and will not permit a trial within this trial -- and that's the concern I have -- regarding the alleged victims' possible conduct.

Accordingly, the three categories of evidence

that the government seeks to preclude, namely, one, the alleged victims' criminal histories; two, other BB gun incidents or uncharged conduct involving the alleged victims; and three, their civil suit against the city, will be allowed only for two limited purposes. First, the evidence may be admitted to demonstrate specific bias. Defendants have not made an argument that any evidence in these three categories would be specifically relevant to show the alleged victims' bias against the defendants.

However, if after direct examination of the alleged victims, defense counsel seek to pursue a line of questioning related to these three categories of evidence or introduce extrinsic evidence to demonstrate specific bias, defense counsel may make a proffer outside the presence of the jury. At that time, after hearing direct examination and the proffered basis for the questioning of introduction of evidence, I will make a determination as to whether it is relevant and appropriate.

Accordingly, decision is reserved as to whether, one, the alleged victims' criminal histories; two, the other BB gun incidents or

uncharged conduct involving the alleged victims; and three, their civil suit against the city will be admitted to demonstrate bias.

I suggest again strongly that reference to these matters should not be made in opening statements, because you will not know in advance what my rulings will be.

Second, evidence may be admitted to demonstrate the defendants' understanding of state -- or state of mind at the scene. Accordingly, evidence of the alleged victims' criminal histories or other BB gun incidents is relevant and admissible to the extent that it reflects defendants' state of mind and understanding of the situation when they arrived at the scene. However, any evidence regarding these incidents that does not relate to what was understood by defendants at the time, including the testimony of witnesses to the incident at the corner of Main and Custer, will be precluded.

Accordingly, this portion of the government's motion is granted in part and denied in part.

And then finally, defendants have jointly sought a court order directing the government to further particularize certain possible or potential evidentiary issues. This relief is denied. The

government is aware of its obligations regarding disclosures, and defendants have not identified any areas where the government has been deficient, unless there's something that the government at this time wants to add to what they've already disclosed.

Those will be my rulings. Mila will distribute the written copy of the bench decision for you to further review, if you choose to do that.

MS. BAUMGARTEN: May I forecast one thing, Judge?

THE COURT: Yes.

MS. BAUMGARTEN: Depending on how the proof goes in, so I understand that that remains in flux. One of the points raised by the defense is essentially that in the event the Court determines it appropriate to permit cross-examination with respect to the initiation of civil lawsuits, the government -- our stipulation was, hey, essentially no one talk about the civil suit, whatever. But in this particular case -- and we did brief it in our memo. I just wanted to highlight this for the Court's further consideration, if the Court gets there, we should be -- our position remains consistent. We should be able to elicit from the

witnesses the amount that was paid and that it was favorable to them. So there's -- I don't want that to be something that isn't addressed or considered as part of that equation.

THE COURT: All right.

MR. CAMBRIA: May I make a suggestion, your Honor, that we be permitted on that 25th date to supplement -- submit some supplementary material regarding introduction of civil suits and what she just spoke about, which would be the offer and compromise or settlement that occurred in the suits. Could we address that? Your Honor, it's a -- not just very relevant, but it's a critical part of our attempt to show bias, motive, et cetera. And so if we could be able to supplement that, I'd appreciate it.

THE COURT: Okay. I think your joint submission there was a reference to the settlement amount, not in terms of specific dollars, but in terms of, you know, kind of a nuisance value type of resolve. I don't know exactly what the terminology was. But in any event, I'll permit that.

MR. CAMBRIA: Thank you.

THE COURT: And if there's anything else

that you think you need to address with respect to the decision and the motions in limine, you can also make that part of your 25th submissions.

MS. BAUMGARTEN: Judge, just so you know, my understanding of the settlement terms is that it was $75,000.

MR. PERSONIUS: We'll address it on the 25th, Judge.

THE COURT: Okay. Okay. That's, I think, everything that I had on my list for today.

MR. PERSONIUS: Your Honor, I had one point that -- that wasn't covered by your written decision or by your earlier remarks. We had asked, consistent with what you've permitted us to do in some recent trials that we've had with you, to consider seven days or so before jury selection to make available to the defense the venire list.

THE COURT: Yeah. You know, I looked into that. I think we can get you the information you're looking for with respect to the jury pool around November 21st.

MR. PERSONIUS: That's outstanding.

THE COURT: Okay?

MR. PERSONIUS: Thank you, Judge.

THE COURT: All right. And that's just

with respect to the names of the jury pool members.

Mr. Connors, anything?

MR. CONNORS: I do, your Honor. May I?

THE COURT: Sure. Give me a little flexibility on that, Mr. Personius. That's about, you know, the soonest date that I could get our jury coordinator to hone in on. You know, we'll get it to you as soon as I possibly can.

MR. PERSONIUS: And even if it's a week before, I think that's enough, Judge. Thank you.

THE COURT: Okay. We'll work and move from the November 21st date. If there's any problems, I'll let everybody know.

MR. PERSONIUS: Thank you, Judge.

THE COURT: Okay.

MR. CONNORS: Your Honor, I'd also worked off a checklist as well, and there are two issues that I request some clarification. In the presentation by the government in their pretrial memorandum they made reference to the possibility of the need for an 801(d) ruling with respect to inconsistent testimony and with respect to hostile witness testimony. But the clarification I seek is that is that simply an alert to the Court that this might come up, or do we have anything that's

already within that category? And the reason I bring up that distinction is because, as the case law that we cited to you, primarily the Leka case, L-E-K-A, if, in fact, there is that -- the existence of that information, under Brady and Giglio it ought to be disclosed to us. Who is the witness who is now inconsistent with the prior testimony that might be sought to be introduced under 801(d)(1)(A)?

THE COURT: Well, that had to go with their substantive evidence argument instruction. I mean, I don't know, you're probably doing that in anticipation of. But is there anything more specific?

MS. BAUMGARTEN: No, Judge. And we continue to turn over things. The defense has gotten some additional things. They made a couple extra requests. We followed through on it. We understand our obligation. And as the Court generally asks us to do in the pretrial order to -- in the event something could come up -- in this circumstance I would say it's unusual to me in that all three of the defendants themselves testified in a deposition. So, that testimony was turned over well -- well before. Could that be inconsistent?

I'm not aware of anybody turning hostile, for example. But if something came out inconsistent, we would turn over the report. We certainly would.

THE COURT: All right. I was aware that there was deposition testimony. But when I read your papers I couldn't tell if there was testimony before the grand jury. Was there?

MS. BAUMGARTEN: We turned all that over, Judge. And we did that early. The Court may recall we did it -- I think the Court usually orders 30 days. We did it in September, so they've had a full opportunity. All of that has been turned over, all the Jencks, everything. With the deposition testimony, it is not only that of the victims, but the three defendants. And my understanding is some folks -- of course, I wasn't involved in that proceeding. Some folks were present during other party's depositions, so that's all been turned over.

THE COURT: Okay. All right. But you are -- I'm going to put you on a continuing obligation. And you've already conceded that you can live with that order.

MS. BAUMGARTEN: Understand, Judge.

MR. PERSONIUS: Judge, before Mr. Connors

goes forward, something occurred to me based on Miss Baumgarten's comment. If the government intends as part of its direct case to offer any testimony -- sworn testimony of any of the defendants, which I thought maybe I heard that in her remark, we would ask that you direct the government to inform us of what that portion of each testimony is in advance if for no other reason than under the rule of completeness, we'd be able to address that before we get into a trial setting, where all of a sudden we're trying to handle that. It would seem appropriate to do that. And I don't see any prejudice to the government.

MS. BAUMGARTEN: Will do, Judge.

THE COURT: Okay. Done.

MR. PERSONIUS: Thank you, Judge.

MR. CONNORS: The last item I have, your Honor, deals with the issue of medical records. There are some rather scant medical records that were disclosed to us. Just not a lot, a few pages. But in looking at them, and having one of our nurse consultants look at it, frankly -- and I don't know if this is any fault of the government at all -- but we don't have all of the medical records. Some of them are illegible and some of them are blacked

out. I understand there may be reasons for blacking out portions of it that are unrelated. But we believe there ought to be a process in place for us to get all the medical records.

MS. BAUMGARTEN: I think those relate to redactions, the blacked out portion, and under local rule we're supposed to redact that. It would be like identifiers, like PII, DOBs and Social Security numbers, things of that type. The records that are available we have turned over. It's not like I have anything better than what has been provided to the defense. I'll be happy to work through it if they think there's something else. But what we have we've turned over, Judge.

MR. CONNORS: Would you be amenable to us making application for a subpoena to have the original records here?

THE COURT: I don't think you have any objection to that, right?

MS. BAUMGARTEN: No.

THE COURT: Okay.

MS. BAUMGARTEN: Just as long as we can all have a chance to take a look at them.

MR. CONNORS: Thank you.

THE COURT: Sure. Okay.

MS. BAUMGARTEN: But once again, Judge, if they're going to use them, I just -- I'm mindful of the fact that there could be personally identifying information. So to the extent that something's going to get used, if we could have the opportunity to get that so we're targeted as to what they're going to identify or mark as an exhibit, so we can look at it not only to be prepared, but only for the PI -- personal identifying information.

THE COURT: You're entitled to it. You made your motion for reciprocal discovery anyway, so it would seem to me it would fall within the ambit of that.

MR. MANGO: Judge, if I might -- Aaron Mango again. If I could maybe chat with Mr. Connors, because some of these records might have been submitted to the government by way of previous grand jury subpoenas during the investigation. So these entities would be under also a continuing obligation to provide us full and accurate records. So we might be able to work this out without having to involve the Court. I just want to let the Court know. I mean, I'll take a lead on this and try to find out exactly what they're looking for and get it for them without

having to go through the court subpoena process, if that is something they're interested in.

THE COURT: Yeah, okay. That makes sense. If there's something specific, please let the government know. I think basically you just thought they were rather sparse at this point in time, and there probably would be more somewhere --

MR. CONNORS: Yes.

THE COURT: -- is kind of the thrust of it. But it wasn't accusatory as I viewed it.

MR. MANGO: Right.

THE COURT: Yeah, whatever you can do to -- not save me work. I don't care about that so much. But, you know, anything you can work out amicably really makes a difference. So please continue to work in that vein, and I think that makes for a better and more efficient trial from both sides' standpoint, and then it makes it, you know, a better scenario for me to preside over the trial, if that's the kind of -- kind of communication that we have throughout this case.

Okay. Thank you very much. Yes, Mr. Personius?

MR. PERSONIUS: I keep doing this, Judge, and I apologize. Were you going to be able to tell

us today what days we would and would not be on trial, or will that come later?

THE COURT: No. I'll get you a submission on that. We're still working through that. I don't have enough information right now to know what my calendar exactly will be. I think the Wednesdays are usually our down calendar days --

THE CLERK: (Inaudible.)

THE COURT: Yeah, we've got to discuss that. I have to see what I can do with rearranging things, because I want to get as much trial time in as we possibly can without interruption.

MR. PERSONIUS: I have one other question, Judge. If you had a whistle and a striped suit last night at the end of the first half, would you have called roughing the kicker?

THE COURT: Well, you know, not knowing if anybody here is from Seattle or not, Mr. Personius, I think I'm going to defer on that one. I'll add that to my bench decision. Interesting call though -- or non-call I guess.

MR. PERSONIUS: Yeah.

THE COURT: Okay.

MR. PERSONIUS: Thank you, Judge.

THE COURT: Thank you very much.

*          *          *          *          *          *

# CERTIFICATION

I certify that the foregoing is a correct transcription, to the best of my ability, from the electronic sound recording of the proceedings in this matter.

s/Michelle L. McLaughlin
Michelle L. McLaughlin, RPR
Court Reporter